All rise. This Honorable Ella Cork, 3rd Judicial District of Delaware, is now in session. Please be seated. Madam Clerk, please call the case. Please stand on item 11, Store Development Company, accounted by Daniel J. Kramer v. City of Joliet, and all appellees by Jeffery Kramer. Please proceed. Thank you. Good morning, Your Honors, and Mr. Platt, on behalf of the City of Joliet, Daniel J. Kramer, representing the appellant. Your Honors, this case involves construction of Illinois statutes as well as some constitutional issues, and we believe the standard of review is de novo for all issues raised. I think to understand this case, there's four points of chronology that have to be taken into account. Illinois passed a law called the Road Improvement Impact Fee Law in July 26 of 1989. The property in question was originally annexed to the City of Joliet by a woman who was then the sole owner named Isabel Serra on December 18 of 1990. On April 9 of 1991, the City of Joliet passed an amendment to its comprehensive plan indicating that Caton Farm, which was a county collector road, would need to be modified to be a four-lane highway. And then finally, that the development never took place in the property until about 1995. The dispute between the parties herein is that we believe as an appellant that the Illinois Road Improvement Impact Fee Law is a preemption of village control or a municipal control of how to collect fees for public improvements outside of a new development. And again, the Act in its general purposes sections in 902 specifically dealt with the issue of new developments. And your client accepted the benefits of the annexation agreement? We certainly did, Your Honor. To the fullest extent? We certainly did. I don't dispute that at all. In our brief, we admit that under paragraph D of the annexation statute of the Illinois Municipal Code, municipalities have a right to do certain exactions and requirements for dedications and public improvements. However, the statute that was passed before that approval of the annexation agreement in 1990, the Illinois Road Improvement Impact Fee Act, specifically in section 919 of that Act, preempts home rule setting of highway impact fees. In other words, they didn't touch anything else about allocation of water fees, sewer, or anything else. It dealt strictly with highway impacts and section 919 specifically holds it preemptive as well as a Kendall County case dealing with land and mining quarries called County of Kendall versus Avery. Very clearly said, when the state through its legislative act specifically preempts a paragraph of the law, then that takes control. We also, in our reply brief, cite the rules of construction that when you have a specific statute overruling a general, the specific controls. So, we indicate, and that's why our position is, that you must, not may, comply with that Road Improvement Act. It also does not give any exemptions or exceptions in the Act. It doesn't say that you can bargain that right or requirement for highway improvement fee allocation away in an annexation agreement. In one sense, there's a great Second District Appellate Court opinion that Chief Justice of the Second District Appellate Court, Justice Jorgensen, rendered right about the time the trial court decision came out in this case. So, Justice Garrison in Will County did not get benefit. It's called the Raintree case. And Raintree dealt specifically with the issue you have raised, Justice Carter. In other words, they have said that what happens in new development cases is we've undergone this explosive growth in the northern Illinois area in the mid-1980s up through about 2005. Municipalities made many exactions of owners and developers. And what they would do in those is they would often include in an annexation agreement or an ordinance that the owner or developer is voluntarily paying these exactions. Justice Jorgensen found that it's anything but voluntary, that usually it's under duress because municipality or unit of local government strictly controls the process. You don't get zoning. You don't get building permits without agreeing to their specific terms. So she found that you must comply with a long-standing test that Illinois developed in the Pioneer Trust case that we filed or cited in our brief. And Illinois has one of the strictest standards. We call for exactions to be compliant with a specifically and uniquely attributable test. Most states in the country are much less burdensome. They either require a rational basis or a roughly proportional test. So what a municipality must show in creating that impact or exaction fee is how does the cost that the owner or developer is being asked to undertake uniquely and specifically benefit your subdivision. If it's an internal street, no question the owner or developer pays 100% of it because without that internal street, the owner has no development. When you have a public accommodation here that no attempt is made to allocate the benefit or burden to that individual owner or annexation agreement party here and its successors, in the general public, it violates that specific and uniquely attributable test. Here in this particular case, we feel that, not feel, but it's argued by the athletes, two general terms of why their decision, trial court decision, should be upheld. They argue that it should be upheld as a matter of contract law, and that was Judge Garrison's reasoning in the summary judgment order that cited the case. We cite that, or argue that that's not permissible because at the time Mrs. Sarek signed the annexation agreement, there was no comprehensive plan for any change of Capeton Farm Road. Capeton Farm Road wasn't within her property, so how could she agree to something that didn't exist? So we cite the Kipnis case for the proposition that that annexation agreement as to road impact fees only was nothing more than an agreement to agree, which is unenforceable. Again, based on the preemption doctrine, section 919 of that road improvement impact fee law, we also cite the Hurley case in our reply brief, and Hurley for two reasons. One is, subparagraph F of the Illinois Municipal Code states that, again, you can include as provided in paragraph B above, legitimate exactions for improvement fees, but subparagraph F of the Municipal Code states you cannot include in an annexation agreement anything that's forbidden by another law. And again, the Illinois Road Impact Fee Law forbids exactions for road improvements unless you go through a process. In the City of Joliet's, and we cite in the brief, they determined to allocate 50% of the cost of widening to four-lane Capeton Farm Road running to the property to our client, and 25% of a signal cost. It's recited in the brief that there were, in effect, four different developers within the subdivision. They're asking us to pay 50%, they're asking two others to pay 25% each of the road improvement, and one developer they got nothing from. And he was the first one in, and certainly got the benefit, as Justice Carter pointed out, of the annexation agreement, and was asked to pay nothing. That violates Section 2 of the Illinois Constitution on equal protection. It also shows that the City failed to comply with the Road Improvement Impact Fee Law, which requires you to, first of all, create a comprehensive road plan. And then you have to have an advisory council that reviews that. Neither of those two things have been done by the City of Joliet. They admitted that their allocation was based simply on Public Works Director, City Manager, and City Economic Development Director sitting down and saying, hey, we think this is a fair allocation. If a traffic study had been done that is required by IDOT when you do roadways, it would show that this development was a very small percentage of traffic in Capeton Farm Road. In fact, the City had already made that decision. Again, and that's why I pointed out, the 1991 date on their amendment to their comprehensive plan, they had made the decision that Capeton Farm Road was going to have to be expanded. Not because of any development on this property. None had occurred until four years later, so they didn't know if it was ever going to be developed. They decided Capeton Farm Road had to be expanded because of ambient or general traffic. And there's no way you can allocate 100% of that cost then that is for ambient traffic onto the three different developers that, again, were required by the city ordinances to approve it. So, on those basis, your honors, I'm sorry, we're asking that you find the preemption doctrine does in fact control that there's been no knowing waiver in this case. How could Mrs. Serak say she waived anything when there was no comprehensive plan for the road improvement done until almost a year after she annexed her property and there's no mention of it into the agreement itself? At the least, if they were trying to negotiate those rights away in an annexation agreement, the city should have a notice of, just as an owner would have to do, an amendment to the annexation agreement to ask for those things. There can be no knowing waiver in this case. With respect to the rest of the act, they, again, they do not comply with the specifics of it in terms of having a study of the cost of the roadway. None of those things were provided and taken into account. So, unless you go through each of those elements that's required under the Road Improvement Fee Act, under sections 903, 904, 905, 906, 907, you cannot have a valid ordinance. And, again, they bootstrap in on the contract theory, the fact that they say owner and developer will comply in all respects with our subdivision control ordinances, which, of course, can be amended time to time, but as I say, not in contravention of the specific statute about road impact fees. Mr. Kramer, at the time the annexation agreement was made, was Caton Farm Road a narrow road that abutted the property? It was a road that abutted the property. I would not say it was a narrow road at all. It was a county collector. It was improved with a two-lane cross section, handled a lot of cars a day. It wasn't a narrow little side street or a residential side street. It was always and still remains a county collector. So I would not define it as a narrow roadway the way the Joliet Ordinance does at all. And who determines? Usually that would be determined by a traffic engineer. In other words, roads are rated for so many trips a day. Caton Farm Road, where I'm familiar with it very much as well, I practice in Kendall County. I've been there 35 years. It's always been in great shape. It's a two-lane blacktop that goes end-to-end in Kendall County and over into Will County. As a two-lane road, it's rated for over 10,000 cars a day by IDOT. So usually the city would acquire a traffic engineer who would give that study and say, now we have X number of cars. If we want it up to an A or B standard, we have to improve it with four lanes. Again, that's what I'm saying precisely, that if you have an advisory committee, if you've done the comprehensive road plan that's called for under the Act, that's where it would determine those things. And Joliet has done none of those. When was the impact in law enacted? In 1989, about a year before the annexation agreement. July 26th of 1989 to be specific. And it is directed to home rule communities. Again, Justice Jorgensen in that Rain Tree case did a comprehensive analysis. It's a very long written opinion of all the impact fee cases she could find in Illinois, home rule or no home rule. And technically, non-home rule communities don't have any authority to do it. Here, we're strictly dealing with the home rule community because the city of Joliet is certainly over 25,000 people. This is my first impact fee case, so I'm learning. Sure, Justice. Would an impact fee be limited to Caton Road, or if there were truly an impact, the plan could encompass improvements to more than one roadway? Oh, absolutely. Let's say that here in this case, Caton Farm happens to be across the frontage of the whole subdivision. And Caton Farm Road is the only road that they're trying to assess the cost of your client? Correct. And in all fairness, stoplight improvements at the entrance. I'm not trying to diminish that. And that road was there when the annexation occurred? Correct. But an impact fee could be later after annexation, there's a lot of roads that need to be improved? I absolutely agree with you. Because of wear and tear, and so those costs can be passed on at the time of building permits? Building permit or approval of final plans, certainly permissible. But that's, again, where the statute has this order. It says for any fee imposed or any type of improvement, you need to, again, do a study of what roads you want to improve. And that could be area-wide, it could be accesses to... But there's a provision in that statute that you can refund fees paid and not used within a certain period of time? It does have a method for refunding. It doesn't get very specific, but it does have a section about refunding. You're absolutely correct. That helps me digest. Sure. And your point about it could have been other area roads, too. In other words, Caton Farm isn't horribly far away from I-80. It's not horribly far away from other state highways. If the city had done that universal comprehensive road plan study, and then said any development, let's say, on the southwest or northwest quadrant of the city of Joliet, will do by housing units so much of a percentage of the impact, perfectly permissible under Raintree and under the statute? You know, Raintree is different from this case, though, isn't it? Because in Raintree, they didn't object when they got a permit, and, you know, they got a permit, right? Here there's much more of an agreement, isn't there? Oh, I don't think it differs in that respect, Judge. Actually, I think it's the same in that it was a prior owner in Raintree who got the annexation zoning, and Raintree was a builder who bought lots in that subdivision and was required to pay that permit, just like this one was. In other words, we were a third owner down the line, Shore Development. It was Mrs. Sarek owned it. She sold it to a Brute Development. Brute sold Phase 2, Unit 3, which is what we're talking about to my client, Shore. So I think identical in that sense that they're trying to get the actual builder of the homes to pay it. And frankly, again, that's our constitutional argument. Gee, if you thought you were going to have just the developers of the subdivision, you should have had Brute as number one, pay it right away, and not hit just these three later on. We think that violates the equal protection and uniformity clauses of the Illinois. But we do think this is exactly on point with Raintree. I know we disagree with the City Council on that, but we believe it's the exact same. Counselor, your time is up. Thank you, Your Honor. Thank you. Counsel, you may proceed. In your position on Raintree, Judge, my position on Raintree is that it doesn't apply to this case. It's a great case. I think it collects the applicable law of the doctrine of specifically and uniquely attributable as applied to municipal requirements on the development of land. It doesn't apply. The starting point for Raintree and Pioneer Trust and Rosen and all the cases that deal with subdivision requirements from the city is whether or not the government has the right under the disguise of the police power to take private property, to take private property, not to enter into a contract, a free bargain, between two individuals with the power to contract to achieve an outcome. In this case, the City of Joliet bargained with the property owner for certain things. The owner wanted the right, a very valuable right, to annex to the City of Joliet to get urban zoning, which essentially means to create lots, retail lots available for sale, and to have the city extend its water and sewer system to the property at absolutely no cost to the owner. Those are extremely valuable things. It's consideration. It supports an agreement. Now, what did Joliet bargain for in return? We bargained for the ability to have our subdivision and development rules apply to the CEREC property. That's what the annexation agreement says. That is consideration. So you have a contract between two actors with the legal authority to enter into agreements. Certainly, Mrs. CEREC, as a citizen that owns property, had the right to enter into a contract regarding that property. The City of Joliet, as a creature of the state and of the 1970 Constitution, is a homeown municipality. Had the authority under the Illinois Municipal Code to enter into an annexation agreement, which is just a contract. And under 11-15.1-2, the annexation agreement section of the Illinois Municipal Code, a city is specifically empowered and authorized to include within that contract provisions regarding subdivision control ordinances and the contribution of land or money to the city or to other jurisdictions in the area that may have some interest in the property being developed. So the city starts from the proposition that all of the cases summarized by Raintree, they're solid black letter law in the state of Illinois regarding what a city can mandate and compel a private property owner to do when it's time to develop property. But those cases don't control the facts of this case. They're not applicable law because what you have before the court today and what Judge Garrison had before the court is not an exercise of regulatory authority by the city. It was the exercise of contractual authority granted by the Municipal Code to municipalities in the areas of subdivision and land development. That distinction, I believe, makes all the difference in this case. The city has no quarrel with Raintree. The city has no quarrel with Pioneer Trust. Those cases, they come from a different area of the law. Those are taking cases. We recognize that the city, if it chose to assert these requirements in a different context without an annexation agreement, would have had to have proceeded with the principles of Raintree and the principles of Pioneer Trust in mind. And that's a strict standard in Illinois. It's a little bit different and a little bit more rigid than the standard that may apply in other states. But we're in Illinois, and Pioneer Trust applies. It just doesn't apply to what happened here. Ms. Zarek recognized a market opportunity to annex her property to the city of Joliet. The city, like most cities, was very much interested in seeing this community grow and to see more commercial and residential opportunities for its residents. And so we entered into a bargaining situation with Ms. Zarek, and the result of that was the annexation agreement that Ms. Zarek agreed to develop that property in accordance with the subdivision regulations. May I ask a question? Yes. The annexation agreement agrees that she would pay public improvements required by Ordinance Number 7208. Yes. Why is this public improvement and widening of Caton Road required by 7208? Ordinance 7208 is our subdivision regulation ordinance. That's our subdivision control ordinance. And I think I cite specific sections of that ordinance in my brief. One of the most applicable sections, I believe, is Section 4.5, and I believe the court referred to it earlier, where a subdivision borders a narrow road or where the city has a comprehensive plan that calls for the realignment or the widening of the road. And that road is located within the four corners of the land to be developed under the subdivision ordinance. Then the city can require the owner to dedicate the land needed for the realignment or the widening and also can require the property owner, the developer in this case, to actually make the improvements for the widening of that road. And I'd like to, and I don't know if that answers your question. But did that comprehensive plan exist at the time of the annexation agreement? There was a different comprehensive plan in 1990 when the property was annexed. And that plan terminated just to the east of Mrs. Sarek's property and did not call for four lanes in front of Mrs. Sarek's property. That is true. And Mr. Kramer would like to make a lot of hay out of that. But I think if you step back from that position and look at what the bargain between the parties happened to be in 1990 when the annexation agreement was enacted, is that the subdivision regulations would apply. And the subdivision regulations have no significance to the development of land until the procedures of that ordinance are initiated with the filing of a subdivision request. At that point, under our ordinance, there then is a planning process which is triggered and all the substantive requirements of the subdivision regulations then come to bear upon the review and implementation of the planning process. So Mrs. Sarek's bargain is that if and when the property was to be developed, then the subdivision regulations would apply. Mr. Kramer himself stated Mrs. Sarek had no intention of developing the property. It was her intention to get municipal entitlements for the property and then to put the property on the market. That's very customary. That's how farmland becomes residential subdivisions in the Chicago area. And that's what happened here. Is it all subdivisions in this area? In Joliet, yes. In this particular area of Caton Road, it's all subdivisions? There's no shopping malls? Well, this area is located about a mile or so west of Illinois Route 59, and Route 59 has businesses on it. The area around Brookside subdivision, which is what Mrs. Sarek's property became, is predominantly, if not exclusively, residential. And as each of the farms that straddle Caton Farm Road were annexed, each of the annexation agreements said that farm would be developed according to the set of rules embodied within the subdivision regulations, and that's what's occurred. We've had the gradual improvement of Caton Farm Road incrementally as annexations occurred, as properties became subdivided, and as residential development occurred. And, again, I was not intending to start with the rangery part of it because that deals with the taking question, and I think that's the easier part of the case perhaps in that this isn't a taking, this is a contract, and so you don't even get to whether or not the Caton Farm Road requirement was specifically uniquely attributable because that only applies when the government wants to take something, force something out of a private property owner. When there's a contract, the parties are free to bargain. Mr. Kramer, I'm a little confused about one thing. Caton Road at the time of the annexation agreement was, and I think the city is arguing that it was a narrow road that abutted the property. Yes. Within the property, actually. Within, okay, that seems to be an area of dispute because Mr. Kramer is saying that Caton Farm Road is not within the four corners of the property. Well, I would refer the court to the plats that are part of the record that clearly show those plats were prepared by Mr. Kramer's client and submitted to the city for approval. They were prepared by a surveyor, and they show Caton Farm Road being within the southern edge of the Sarek Farm. And is that all of what you're proposing to develop as the four-lane highway is within that property, or is there part of it that's outside? Actually, what we required Schor to do was to upgrade the north half of Caton Farm Road, the westbound lanes, those are still two lanes, okay? Not four, two. And both of those lanes are within the edge of the Sarek property, okay? And you raised the question during the first part of the argument, who decides if it's a narrow road? Well, I suggest the mayor and city council do that. It's their subdivision ordinance under Illinois law. They make the planning and zoning decisions regarding these matters. They decide what the plan is going to be for the improvement of roads and whether or not an upgrade is necessary. So they have all the ability in the world, whether or not the plan was developed, to declare at the time of subdivision application that Caton Farm Road was narrow and needed widening, they also had the authority to do that by adopting a new plan, which they did, in fact. In 1991, St. Caton Farm Road needed to be four lanes. So at the time, Mrs. Sarek was able to sell her property to a home builder. The four-lane requirement for Caton Farm Road, two lanes of which were to be located on the Sarek property, that was a record. And the buyer of that property, of the Sarek property, understood that application and depicted the widening of Caton Farm Road and all of the subdivision plats that were submitted and approved by the city. And that was done beginning in 1995, more than four years before shore development showed up in the scene at all. So Joliet was approving subdivision units, allowing homes to be built, in reliance on the fact that this property, the developer of this property, would provide the Caton Farm Road improvements, which the city had bargained for. Now, again, I believe this is a contract case, not a taking case. I believe the subdivision regulations provided the city an opportunity to require these improvements. There's no allegation we didn't follow our ordinance. When Joliet annexes a property and allows for the initial subdivision of a property, we look to the entire holding. In this case, it was a Sarek farm. It was to be known as the Brookside subdivision. And the requirement that Caton Farm Road be widened attached to the entire piece. And so as the original developer built out the subdivision, that requirement was there. Now, the complication in this case, where the dispute really comes from, is that the situation changed. In 1999, 2000, 2001. What was initially one farm sold to one developer for one subdivision, okay, and the city was dealing with one party in control of the entire site, that all changed. Due to events beyond the control of the city. The original developer sold pieces of the property to three separate entities. Counselor, you have two minutes. Thank you. And so that created a quandary for us. Rather than dealing with one entity with control of the entire site, we now had the public responsibility to deal with three entities and to fairly allocate responsibility for Caton Farm Road between the three. One of the three was a church. That church was not connected physically to the rest of the subdivision. There was a drainage well, and they had frontage on Caton Farm Road. We allocated their frontage responsibility to them. They posted a letter of credit for that. The other two entities were retail home builders. Each had the same number of lots for sale, so we divided the remaining responsibility for Caton Farm Road between those two on a 50-50 basis. Not rocket science. To me, it's common sense and fair. That's what we did. And why wasn't Broody included? Broody had sold. His property was gone. There was nothing left. And so when Broody created three entities, we had to deal with that. But all those requirements were of record when the three came on the scene. In closing, I know I only have a minute or so left. Joliet did not impose a road improvement impact fee on shore. A road improvement impact fee is a monetary obligation for regional improvements. Joliet imposed a construction responsibility for a specific physical improvement on the land to be developed. That's a world of difference between subdivision power and a road improvement impact fee. We did not impose that fee. I find it interesting that the state, and if you look at the legislative history, the state was attempting to deal with a new type of municipal activity on top of the subdivision power to impose a monetary obligation for regional improvements. We didn't do that. This was a core traditional exercise of the subdivision power. And the state, if they wanted to restrict the subdivision power, why would they have adopted this law and put it in the highway code? They didn't put it in the county's code. They didn't put it in the municipal code. They didn't specifically preempt the subdivision power. They put it in the highway code. And they left non-home rural cities out of the picture. Well, certainly non-home rural cities have the authority to regulate subdivision improvements. If the legislature wanted to use the road improvement impact fee law to preempt subdivision power, you would have found it in the municipal code and it would have affected everybody, not just counties. Thank you very much. I don't know if there are any other questions. Thank you. Councilman. Thank you, Your Honor. Your Honors, this case, the beginning, middle, and end boils down to one main question that's never been answered by the city of Philly yet. And that is, why, as a home rural community, would they not be governed by the Illinois road improvement impact fee law? And the answer is, there are no exceptions and no exemptions. I commend you to look at the definition section of 904 of that act. And it defines what a road impact fee is. And that's any improvement to roads, acquisition of right-of-way, any enlargement. Section 904 also defines what a fee is. And both of those are covered here. Again, I think Justice Wright, you asked a very good question. Was there a comprehensive plan? Did it have an effect at the time Mrs. Sarek sold the property? The answer was, yes, about a mile to the east. But there was nothing in that plan to indicate there was any change to Capeton Farm Road. So she didn't enter into that agreement knowing she was buying into either additional dedication or improvement costs, whether for herself or for future buyers, for regional improvement in Capeton Farm. But the next question is, did that comprehensive plan exist when you bought it? Absolutely. But, and there's always buts with us lawyers, that comprehensive plan was absolutely ineffective under the road improvement impact fee law. I was on Mr. Blyman's side as Municipal Attorney for 25 years, and he's right. The ultimate but stops with the City Council and Mayor. But that law specifically provides you have to have a comprehensive road plan. You have to, not may, create an advisory committee and they have to approve it. So when they simply amended their comprehensive plan and said in the future we think Capeton Farm Road should be expanded, it did not comply with the 1989 Act, even remotely. So that amendment, or attempted amendment to their comprehensive plan, it's fine if they're going to pay the freight out of their own funds or government grants, but it's not fine and it does not comply with the law if you're exacting either dedication or money from the developer. And again, Raintree wasn't limited to taking, it was about impact fees. That was the whole situation that that downstream builder was being asked to pay it. With non-home road communities, which aren't ethical here, Raintree holds there's no authority for it at all. You can't exact it, not by contract, not by any way. Again, if you could simply sign a contract, you would totally emasculate this road improvement fee law for home road communities. And Subdivision F of the annexation ordinance specifically states under the Municipal Code, you cannot include in an annexation agreement a term or condition that is forbidden by another law. And based on that home rule statute on the Road Improvement Fee Act, we haven't seen one single reason that the city of Joliet isn't bound by that act. And no statute in the state of Illinois or this country would be enforceable if you could waive it away at the whim of the parties. Thank you, your honors. Thank you. The court will take this case under advisement and render a decision with dispatch.